**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                              :

RONALD LEIBNER,              :

                       :       Civil Action No. 12-4104 (FLW)

            Plaintiff,   :

                       :

      v.                   :

                       :       **OPINION**

BOROUGH OF RED BANK POLICE  :

DEPARTMENT, <u>et al.</u>,        :

                       :

           Defendants.  :
_____:

**<u>WOLFSON, United States District Judge</u>:**

Plaintiff Ronald Leibner ("Plaintiff" or "Leibner") initiated this § 1983 action against defendants Borough of Red Bank, Borough of Red Bank Police Department, Red Bank Chief of Police Stephen G. McCarthy, individually and in his official capacity, Red Bank Police Sergeant Robert J. Gannon, individually and in his officially capacity, (the "Red Bank Defendants"), Brookdale Community College ("BCC"), BCC Police Department, BCC Police Captain Thomas Hartman, individually and in his official capacity, BCC Police Officer Joseph Szotak, individually and in his official capacity, BCC Police Officer Colton Hilbert, individually and in his official capacity, (the "BCC Defendants"), and County of Monmouth ("Monmouth") (collectively, "Defendants").[1]  This action arises out of Plaintiff's arrest, and subsequent conviction, for a disorderly persons offense in violation of N.J.S.A. 2C:33-2(a) following a fireworks event in Red Hook, New Jersey, on the evening of July 3, 2011.  Plaintiff alleges that

---

[1]     The State of New Jersey was originally a named defendant, but was dismissed from the case on October 12, 2012.  <u>See</u> Order, dated Oct. 12, 2012.

several police officers on duty that night used excessive force in effecting Plaintiff's arrest, violating his constitutional rights.   The Complaint includes additional § 1983 claims arising from Plaintiff's arrest, as well as New Jersey common law claims of assault and battery, false imprisonment, negligence, and intentional infliction of emotional distress, and a claim under the New Jersey Civil Rights Act ("NJCRA").   Presently before the Court are two motions: (1) Defendant Monmouth's motion to dismiss all Counts of the Complaint, and (2) BCC Defendants' combined motion to dismiss Counts II and VIII in their entirety, Counts III and IV as to Defendant Hartman, and for summary judgment on all remaining Counts.   For the reasons that follow, the Court GRANTS both motions.

## I.      BACKGROUND

The following facts are taken from Plaintiff's Complaint and, for the purposes of these motions, are undisputed by both Defendant Monmouth and the BCC Defendants unless otherwise noted.   In connection with the motions to dismiss, the Court will assume these facts as true; additional facts will be set forth with respect to the BCC Defendants' motion for summary judgment.   Moreover, the Court will only recount those allegations pertinent to resolving the instant dispute.

On July 3, 2011, Plaintiff was with friends in Red Bank, New Jersey, watching the evening fireworks display.   Compl., ¶¶ 11-12.   After the fireworks ended, Plaintiff began driving home in his car, leaving the area near the marina and entering the intersection of Boat Club Court and West Front Street around 10:00pm.   Id. at ¶¶ 13-15.   Plaintiff then attempted to turn onto West Front Street, which apparently, unbeknownst to Plaintiff, was closed to vehicular

traffic; Plaintiff encountered a large crowd in and around the roadway that quickly began to surround his car.   Id. at ¶¶ 16-18.

Present in this area at that time were Defendants BCC Police Officers Szotak and Hilbert.[2]   Id. at ¶ 19.   Defendants Szotak and Hilbert approached Plaintiff's vehicle and ordered Plaintiff out of his vehicle.   Id. at ¶¶ 21, 23.   Once Plaintiff had exited his car, Officer Hilbert, with Officer Szotak present, executed a "take down" manoeuver of Plaintiff by grabbing him, lifting him up, and then forcing him down to the ground, placing Plaintiff on the pavement and handcuffing him behind his back.   Id. at ¶¶ 24-25.   Plaintiff was subsequently charged with a disorderly persons offense in violation of N.J.S.A. 2C:33-2(a),[3] and convicted in municipal court on December 1, 2011.   See BCC Mot. to Dismiss, Ex. (Decision of Judge Berube).[4]   This conviction was upheld on appeal to the New Jersey Superior Court, although Plaintiff's sentence was adjusted. See Pl. Opp. to BCC Def., Ex. G (Decision of N.J. Sup. Ct., Monmouth Vicinage). Plaintiff then filed an eleven-count Complaint against Defendants.[5]

---

[2]      Defendant Red Bank Police Sergeant Gannon was also present in the area.   Although not clear from the Complaint, he apparently was not directly involved in effecting Plaintiff's arrest, but rather was in the nearby vicinity and processed Plaintiff's arrest in a mobile police unit after Officers Hilbert and Szotak had handcuffed Plaintiff.   See, e.g., Leibner Cert. in Opp. to BCC Defs., ¶ 42.   Plaintiff further alleges that Defendant Gannon supervised Officers Hilbert and Szotak.   Compl., ¶ 21.   Beyond this, Defendant Gannon is irrelevant to the instant motions because they concern only Defendant Monmouth and the BCC Defendants.

[3]      N.J.S.A. 2C:33-2(a) provides:
         A person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he
         (1) Engages in fighting or threatening, or in violent or tumultuous behavior; or
         (2) Creates a hazardous or physically dangerous condition by any act which serves no legitimate purpose of the actor.

[4]      Although this fact is absent from Plaintiff's Complaint, the Court takes judicial notice of Plaintiff's conviction and subsequent appeal, which are matters of public record properly considered in a motion to dismiss.   Sands v. McCormick, 502 F.3d 263, 268 (3d. Cir. 2007).

[5]      The Complaint contains a twelfth count incorporating all previous counts against fictitious defendants.

3

## II.    STANDARD OF REVIEW

### A.  Motion to dismiss

In reviewing a motion to dismiss for failure to state a claim under 12(b)(6), a Court must take all allegations in the complaint as true, viewed in the light most favorable to the plaintiff "and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted).   In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court "retired" the language in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Twombly, 550 U.S. at 561 (quoting Conley, 355 U.S. at 45-46).   Rather, the factual allegations in a complaint "must be enough to raise a right to relief above the speculative level." Id. at 555. The Third Circuit summarized the pleading requirement post-Twombly:

> The Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element.'

Phillips, 515 F.3d at 234 (citation omitted) (quoting Twombly, 550 U.S. at 556).

In affirming that the Twombly standard applies to all motions to dismiss, the Supreme Court further clarified the 12(b)(6) standard.   "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss."   Id. at 679.   Accordingly, "a court considering a motion to

4

dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.   In short, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009).

**B.  Motion for Summary Judgment**

Courts will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52.   A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. See id. at 252. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts "in the light most favorable to the [non-moving] party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion."   Celotex v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party then carries the burden to "designate 'specific facts showing that there is a genuine issue for trial.'"   Id. at 324. Moreover, the non-moving party may not rest upon the mere allegations or denials of its pleading.   Id. at 324; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).   The non-moving party must "do more than simply

show that there is some metaphysical doubt as to the material facts."   Matsushita, 475 U.S. at

586.   A mere "scintilla of evidence . . . will be insufficient."   Anderson, 477 U.S. at 252.

## III.   DISCUSSION

### A.  Monmouth's Motion to Dismiss

Monmouth argues that Plaintiff's Complaint against it should be dismissed for failure to

state a claim upon which relief can be granted because Plaintiff has not pled any facts showing

the involvement of Monmouth or its employees in Plaintiff's arrest.[6]   Specifically, Monmouth

argues that the only named individual defendants in the Complaint are alleged to be Red Bank or

BCC police officers – not employed by, let alone associated with, Monmouth – and that none of

the actions or events Plaintiff complains of involve Monmouth's policies or customs.   Plaintiff

raises several arguments in opposition to Monmouth's motion to dismiss, all of which turn on

speculation that Monmouth may have been involved in Plaintiff's arrest.   In that regard,

Plaintiff contends – notably, in his opposition papers but not by any pleading in his Complaint –

that his claims against Monmouth are not facially deficient because they are premised on a

theory of vicarious liability for, inter alia, the municipality's policy or practice that led to

Plaintiff's alleged constitutional injury.

The Third Circuit has recently reaffirmed that a municipality "may not be held liable for

constitutional torts under § 1983 on a vicarious liability theory rooted in respondeat superior . . .

but it can be held responsible when the injury inflicted is permitted under its adopted policy or

---

[6]      Monmouth's moving papers are styled as a motion to dismiss, however Monmouth
attached a statement of material facts and included as an exhibit a certification from the Sheriff
of Monmouth County.   Plaintiff responded with his own statement of material facts, but also
argued against considering any evidence apart from the pleadings in connection with
Monmouth's motion to dismiss.   Because I conclude that Plaintiff's Complaint on its face fails
to state a claim against Monmouth, I will not consider Plaintiff's or Monmouth's statement of
material facts or the Sheriff's certification.

custom."[7]  Mulholland v. County of Berks, __ F.3d __, __, 2013 WL 310209, at *6 (3d Cir.

2013) (citation omitted; internal quotation marks omitted); Beck v. City of Pittsburgh, 89 F.3d

966, 971 (3d Cir. 1996) ("When a suit against a municipality is based on § 1983, the municipality

can only be liable when the alleged constitutional transgression implements or executes a policy,

regulation or decision officially adopted by the governing body or informally adopted by

custom." (Citing Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978))).   In

other words, in order to state a claim for § 1983 municipal liability, Plaintiff must have pled a

policy or custom of Monmouth that led to the Officers' alleged use of excessive force.

Plaintiff's Complaint is facially insufficient in this regard.   The Complaint includes no

allegation, or even suggestion, that Monmouth's employees were present at Plaintiff's arrest or

that Monmouth had a policy or custom that controlled the arresting Officers and related to

Plaintiff's arrest.   Thus, for this reason alone, Plaintiff has failed to state a claim against

Monmouth for vicarious liability under § 1983. See Mulholland, __ F.3d __, __, 2013 WL

310209, at *7 ("[T]o establish municipal liability under § 1983, [a plaintiff] must show that they

were deprived of 'rights, privileges, or immunities secured by the Constitution and laws,' and

that the deprivation of those rights was the result of an official government policy or custom.").

Plaintiff nonetheless argues in his opposition papers that a motion to dismiss is premature

because he could possibly establish liability against Monmouth on the basis that the other

Defendants, such as the Red Bank Defendants, might have hired outside police help for the

fireworks event on July 3, 2011, and that this outside help may have included Monmouth.

Plaintiff contends that the Red Bank Police Department had issued a "general call for

---

[7]        Thus, to the extent that Plaintiff argues that Monmouth should be liable under a simple
theory of respondeat superior, that claim fails as a matter of law.

assistance," and that Monmouth "may" have responded to that call.   Accordingly, Plaintiff claims that dismissal at this stage is premature because it cannot be determined as a matter of law that Plaintiff has failed to state a claim against Monmouth, and thus Plaintiff is entitled to additional discovery on this issue.   Plaintiff's reasoning is misguided.

To begin, as noted above, the Complaint is wholly devoid of any allegation of a causal connection between the events surrounding Plaintiff's arrest and Monmouth or an allegation of any custom or practice adopted by Monmouth that related to Plaintiff's arrest.   Indeed, in Count V of the Complaint, which corresponds to Plaintiff's § 1983 claim predicated on unlawful custom, practice, policy, and/or inadequate training, Plaintiff does not name or otherwise identify Monmouth.[8]   The only reference to Monmouth is in the general list of Defendants named in the Complaint.   See Compl., ¶ 3.   Moreover, there are simply no factual allegations that connect Monmouth to Plaintiff's arrest in any plausible way.   Plaintiff merely speculates in his opposition papers that there might be some indirect or direct involvement of Monmouth. Yet, as Monmouth aptly argues in its reply papers, Plaintiff's contention that Monmouth may have been involved simply because of its relative geographic proximity to where Plaintiff's arrest took place could be extended to encompass virtually any other county or municipality in the region.   Plaintiff's contention is rank speculation, and, more pointedly, unsupported by any factual allegation in the Complaint.   Plaintiff's argument is therefore is insufficient to defeat Monmouth's motion to dismiss.[9]   Iqbal, 556 U.S. at 679 ("[O]nly a complaint that states a

---

[8]       This absence is made more conspicuous because Plaintiff specifically identifies other Defendants, individual and municipal, in Count V.

[9]       For the same reason, Plaintiff's contention in his sur-reply that BCC is "sponsored by the citizens of Monmouth County" is insufficient to demonstrate the requisite elements of § 1983 municipal liability.   Again, there can be no § 1983 municipal liability based on a theory of respondeat superior, and thus the mere fact that some connection may exist between BCC and

plausible claim for relief survives a motion to dismiss."); Twombly, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . .").   In sum, Plaintiff fails to allege or even plausibly argue that Monmouth had a policy or custom that somehow caused Plaintiff's alleged constitutional injury, and accordingly I conclude that Plaintiff has failed to state a cognizable claim against Monmouth.[10]   Accordingly, the Court GRANTS Monmouth's motion to dismiss; Plaintiff's claims against Defendant are DISMISSED in their entirety.

### B.  BCC Defendants' Motion to Dismiss

The BCC Defendants move to dismiss Counts II and VIII of the Complaint in full, and Counts III and IV as to Defendant Brookdale Police Department Captain Thomas Hartman only. Specifically, the BCC Defendants argue with respect to Counts II and VIII that Plaintiff's § 1983 and common law false arrest and false imprisonment claims are barred by the doctrine set forth in Heck v. Humphrey, 512 U.S. 477, 486-87 (1994).   The BCC Defendants also argue that Counts III and IV should be dismissed as to Defendant Hartman because Plaintiff has not pled that Defendant Hartman was present at the scene when Plaintiff was arrested, and has failed to adequately plead the elements of § 1983 supervisory liability in accordance with Third Circuit law.   I address each of these claims in turn.

In Heck v. Humphrey, supra, the United States Supreme Court held, inter alia,

> that in order to recover damages for allegedly unconstitutional conviction or
> imprisonment, or for other harm caused by actions whose unlawfulness would

---

Monmouth does not show that Monmouth had a policy or custom that controlled the arresting Officers and related to Plaintiff's arrest.

[10]   For the same reason, I reject Plaintiff's argument that he is entitled to discovery on this issue.   Plaintiff has not plead "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element" of Monmouth's involvement in the complained of action.   See Philips, 515 F.3d at 234 (internal quotation marks omitted).

> render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

Heck, 512 U.S. at 486–87.  Thus, the central inquiry is whether the claims asserted by the plaintiff would "necessarily imply the invalidity of [his] conviction."  Wallace v. Kato, 549 U.S. 384, 398 (2007) (Stevens, J., concurring) (quoting Heck, 512 U.S. at 486–87).

In the present case, it is largely undisputed that the Heck doctrine acts to bar Plaintiff's wrongful arrest and imprisonment claims.  These claims arise from Plaintiff's arrest and subsequent state municipal court conviction of a disorderly persons offense in violation of N.J.S.A. 2C:33-2(a).  See BCC Mot. to Dismiss, Ex. (Decision of Judge Berube).  This conviction was upheld on appeal and thus remains valid.  See Pl. Opp. to BCC Def. at Ex. G (Decision of N.J. Sup. Ct., Monmouth Vicinage).  For that reason, Plaintiff's wrongful arrest and imprisonment claims asserted against the BCC Defendants necessarily attack the validity of Plaintiff's arrest and prosecution. See Gilles v. Davis, 427 F.3d 197, 208-209 & n.8 (3d Cir. 2005).  In order for the Court to find that Plaintiff has a cognizable wrongful arrest or imprisonment claim, the Court would necessarily have to find that Plaintiff's disorderly persons conviction was invalid.  Such a result, however, is precluded by Heck.  Significantly, Plaintiff effectively concedes that Counts II and VIII of the Complaint are barred by Heck by providing no argument or reasoning that would allow this Court to conclude otherwise.  See Pl. Opp. to BCC Def. at 41-42.  Plaintiff does not meaningfully oppose the BCC Defendants' motion to dismiss in this regard, arguing only that "[e]ven if the ruling in Heck bars Plaintiff's § 1983 clams for false arrest or false imprisonment and his common law claim for false imprisonment,

10

other viable claims remain against the [BCC] Defendants remain . . . ."   Id. at 41; see also id. at
41-42 ("Thus, even if the underlying municipal court decision must be taken as established under
Heck . . . claims based upon the use of excessive force, inter alia are still viable.").   Accordingly,
I conclude that Count II, § 1983 claim false arrest and false imprisonment, and Count VIII,
common law claim false arrest and false imprisonment, of Plaintiff's Complaint are barred by
the Heck doctrine..[11]   The Court therefore GRANTS the BCC Defendants' motion to dismiss
Counts II and VIII of the Plaintiff's Complaint with respect to these Defendants.

The BCC Defendants also move to dismiss Counts III, § 1983 claim for failure to
intervene, and IV, § 1983 claim for supervisory liability, as to Defendant Hartman.
Specifically, the BCC Defendants argue that Plaintiff's Complaint is devoid of any allegation
that Defendant Hartman was present at the time of Plaintiff's arrest following the fireworks
show.   The BCC Defendants thus claim that Plaintiff has failed to state a cause of action under
Third Circuit law for Count III, failure to intervene, or Count IV, supervisory liability.

Plaintiff concedes that he has not pled that Defendant Hartman was present or involved in
Plaintiff's arrest.   Indeed, as I discussed in connection with Monmouth's motion to dismiss, the
only officers alleged to have been present and involved in Plaintiff's arrest are Defendants
Gannon, Szotak, and Hilbert.   Furthermore, Plaintiff agrees that he has not stated a claim under
Third Circuit law against Defendant Hartman for failure to intervene or supervisory liability.
See Pl. Opp. to BCC Def. at 42 ("Under [the Third Circuit's] rule, liability appears to be
excluded if Hartman was not present during the violation of the Plaintiff's rights."); see also

---

[11]      Furthermore, I note that Heck routinely has been applied by courts in this district to bar §
1983 false arrest claims where the plaintiff in those cases had pled guilty to a disorderly persons
charge.   See Ference v. Township of Hamilton, 538 F. Supp. 2d 785, 790-91, 800-801 (D.N.J.
2008); Garrison v. Porch, No. 04-1114, 2007 WL 776799, at *3 (D.N.J. Mar. 9, 2007).

Smith v. Mensinger, 293 F.3d 641, 651 (3d Cir. 2002) ("[A]n officer is only liable [under a theory of § 1983 supervisory liability] if there is a realistic and reasonable opportunity to intervene."); Baker v. Monroe Township, 50 F.3d 1186, 1194 (3d Cir. 1995) (section 1983 supervisory liability requires "actual knowledge and acquiescence").

Plaintiff nevertheless argues that other circuits allow for supervisory liability in broader circumstances, e.g., if a supervisor acted in "reckless disregard" of a situation, see, e.g., Hall v. Lombardi, 996 F.2d 954, 961 (8th Cir. 1993), and that under this standard Plaintiff's claim would survive the BCC Defendants' motion to dismiss.[12]   As Plaintiff recognizes, however, Third Circuit case law controls, and therefore Plaintiff's arguments regarding a more expansive standard for supervisory liability necessarily fail.   See Pl. Opp. to BCC Def., 42 ("Plaintiff recognizes that such an argument [regarding the scope of § 1983 supervisory liability] is most properly directed to an appellate court.").   Accordingly, I conclude that Plaintiff has failed to state a claim for failure to intervene and for supervisory liability against Defendant Hartman, and I therefore GRANT the BCC Defendants' motion to dismiss Counts III and IV of Plaintiff's Complaint as to Defendant Hartman.

## C.  BCC Defendants' Motion for Summary Judgment

The BCC Defendants move for summary judgment on all remaining claims. Specifically, the BCC Defendants argue that summary judgment is proper on Count I, Plaintiff's excessive force claim, on the basis that the arresting officers, Defendants BCC Police Officers Joseph Szotak and Colton Hilbert (hereinafter, "Officer Szotak" and "Officer Hilbert,"

---

[12]      I note that it seems Plaintiff's supervisory liability claims against Defendant Hartman would likely still fail even under the broader standard of "reckless disregard" because Plaintiff's Complaint does not appear to contain allegations sufficient to support reckless conduct on the part of Defendant Hartman in connection with Plaintiff's arrest.

respectively, and "Officers," collectively), used a reasonable amount of force to effect Plaintiff's arrest, and, further, that the doctrine of qualified immunity shields the Officers, and thus the BCC Defendants, from liability.[13]   Plaintiff opposes summary judgment primarily on the ground that disputed issues of material fact exist as to whether the amount of force used to arrest Plaintiff was reasonable.   In that connection, both Plaintiff and the BCC Defendants rely heavily upon video footage of Plaintiff's arrest (the "Video") to support their summary judgment arguments.[14]   Because the existence of the Video along with Plaintiff's underlying disorderly persons conviction affect this Court's summary judgment analysis, I address those issues first.

### 1. Heck and Video Evidence

As already noted, the BCC Defendants' motion for summary judgment requires the Court to view the facts surrounding Plaintiff's arrest and excessive force claims in the light most favorable to Plaintiff.   Nevertheless, in accordance with Heck, 512 U.S. 477, the Court will not draw inferences in Plaintiff's favor that would necessarily negate the findings of the municipal court in connection with Plaintiff's conviction of a disorderly persons offense.   See Ference v. Township of Hamilton, 538 F. Supp. 2d 785, 790 (D.N.J. 2008) (citing Heck, 512 U.S. 477). Additionally, the Court will not draw inferences in Plaintiff's favor that are inconsistent with the Video evidence capturing Plaintiff's arrest.   See Scott v. Harris, 550 U.S. 372, 380-81 (2007)

---

[13]   Plaintiff's claims in this regard are not barred by the Heck doctrine.   See Garrison v. Porch, 376 F. App'x 274, 278-79 (3d Cir. 2010) (holding that prior conviction for assault following lawful arrest does not necessarily bar a § 1983 excessive force claim); Nelson v. Jashurek, 109 F.3d 142, 145-46 (3d Cir. 1997) (same, but in context of conviction for resisting arrest).

[14]   The Video was apparently captured by a camera associated with the Redbank-Shrewsbury Patch, a local internet-based news service, and is available at http://redbank.patch.com/articles/man-arrested-in-post-kaboom-melee-fights-back#video-6870 113.   See Pl. Mat. Facts, ¶ 22.   The parties do not contest the authenticity of the Video, each relying on it in their arguments, and accordingly the Court will refer to this version of the Video in deciding the BCC Defendants' motion for summary judgment.

("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment . . . [and thus, t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").   Specifically, the existence in the record of a videotape capturing the events underlying an excessive force claim presents an "added wrinkle" to the usual standard which requires courts "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Id. at 378 (Citations omitted). Accordingly, where the BCC Defendants' and Plaintiff's recitation of relevant facts differ, the Court will endeavor to resolve those disputes when possible by relying on the facts depicted in the Video and on the municipal court findings necessary to uphold Plaintiff's disorderly persons conviction.

### 2. Additional Facts Relevant to Summary Judgment

The following additional facts supplement the facts detailed at the outset of this Opinion, and are undisputed by the parties unless otherwise noted.[15]   Plaintiff's encounter with the Officers began after Plaintiff turned onto West Front Street, which was closed to traffic and full of pedestrians.[16]   See Video at :03s.   Officers Szotak and Hilbert approached Plaintiff's car

---

[15]     These facts are drawn primarily from those facts underlying Plaintiff's disorderly persons conviction and from the Video; other facts are taken from the parties' statements of material facts.

[16]     The Officers were not wearing their traditional uniforms, and were instead wearing polo shirts with embroidered police badges on the front and the word "POLICE" across the back. See Pl. Opp. to BCC Def., Ex. D at p.18 (Decision of Judge Berube).   Plaintiff contends that while he was seated in his car, he was unable to observe the Officers' clothing or badges in a meaningful way, and thus unable to identify the Officers as such.   I note, however, that when Plaintiff was convicted of his disorderly persons offense, the state court based its decision in part on Plaintiff's "continued operation [of his vehicle] . . . even against the express[] orders of police

near the driver's side front door of the car after the car had stopped.  Id.  The parties dispute whether Plaintiff had come to a complete stop with the engine off at the time the Officers approached, and it is unclear from the Video if the car was parked or if the engine had been shut off.   At this point, the car was surrounded on all sides by a dense crowd of people who were loud and boisterous, except for a small area immediately adjacent to Plaintiff's driver's side car door, which was occupied by the Officers.[17]  Id.

The relevant sequence of events began when Officer Szotak approached Plaintiff's car, leaned down and opened Plaintiff's car door.  Id. at :03s-:04s.   Once the door had been opened, Plaintiff remained seated for a brief moment before beginning to slowly exit. Id. at :03s-:06s. During this time, Officer Szotak was reaching into the car in an attempt to extricate Plaintiff from the vehicle, with Officer Hilbert assisting.  Id. at :05s-:10s.

Immediately after Plaintiff had fully exited the vehicle, Officers Szotak and Hilbert took positions standing in front and to the side of Plaintiff.  For several seconds, the Officers attempted to secure Plaintiff's hands.  Id. at :10s-:13s.  The parties dispute whether Plaintiff complied with the Officers' handcuff attempt, with the Officers claiming that Plaintiff "hand checked" the Officers by pulling his hands away whenever the Officers attempted to secure Plaintiff.  In the Video, this portion of the encounter is partially obscured from the camera by Plaintiff's car and Plaintiff's body, and it thus unclear the extent of Plaintiff's compliance with the Officers.  Id.  Nevertheless, it is clear from the Video that Plaintiff was not standing perfectly still at this time; moreover, the municipal court made findings that Plaintiff was not

officers who identified themselves."  Id.  Thus, the Court will not fully credit Plaintiff's argument that the Officers were not easily identifiable as police, given the apparent nature of the Officers' clothing as seen in the Video and the findings of Judge Berube.

[17]     I note that because of the presence of this large and noisy crowd, it is impossible to discern the verbal exchange, if any, between Officers and Plaintiff in the Video.

compliant with the Officers' handcuff attempts.   See Pl. Opp. to BCC Def., Ex. D. at 16-17 (Decision of Judge Berube).

After approximately two seconds, the Officers ceased their attempt to secure Plaintiff's hands.   Instead, the Officers executed what has been referred to in this litigation as a "take down" maneuver.   Officer Szotak bent over, placed his head near the left side of Plaintiff's waist, and his arms around Plaintiff's lower body.   Id. at :13s.   Within a matter of seconds, Officer Szotak had lifted Plaintiff slightly off the ground, turned Plaintiff's body, and lowered him down to the ground.   Id. at :13s-:16s.   Notably, although the take down maneuver occurred in a short span of time, Officer Szotak's actions were relatively slow and controlled, and at no point was Plaintiff thrown down or dropped to the ground.   Id.   During this time, Officer Hilbert was standing to the side of Plaintiff and assisting Officer Szotak as Plaintiff was being placed on the ground.

Once Plaintiff was on the ground, both Officers took various positions on top of, or nearly on top of, Plaintiff's body.   Id. at :18s-:20s.[18]   This portion of the encounter lasts several seconds, with Plaintiff attempting to move out from under the Officers control.   Id. at :20s-:35s. Eventually, the Officers were able to secure Plaintiff when Officer Hilbert handcuffed Plaintiff behind his back.[19]   Id. at :35s.   Throughout Plaintiff's arrest, the crowd of people surrounding the incident remained large, dense, and noisy, and when Officer Hilbert was handcuffing Plaintiff, the crowd clearly can be heard in the Video chanting "USA."

---

[18]      During this portion of the arrest, the angle of the camera in the Video does not fully capture the entirety of Plaintiff's body or the Officers' actions.   The facts relevant to this portion of the arrest are, however, largely undisputed.

[19]      The Video ends shortly thereafter, with Plaintiff still on the ground and Officers Hilbert and Szotak near Plaintiff.   It is undisputed, however, that Plaintiff was then transferred to a nearby mobile police unit where Defendant Gannon processed Plaintiff's arrest.   See Pl. Mat. Facts, ¶ 150.

### 3. Excessive Force Claim and Qualified Immunity Defense

The BCC Defendants move for summary judgment on Plaintiff's excessive force claim, Count I of the Complaint,[20] arguing that in light of the Video evidence, there can be no dispute that the Officers' use of force was objectively reasonable, and, furthermore, that Plaintiff's excessive force claim is nevertheless barred by the doctrine of qualified immunity. Plaintiff opposes summary judgment, contending that the issue of whether the Officers used reasonable force is a question for the jury, and one that must be decided before addressing the BCC Defendants' qualified immunity defense. I address each of the BCC Defendants' arguments in turn.

The use of excessive force can constitute an unlawful "seizure" under the Fourth Amendment. See Graham v. Connor, 490 U.S. 386, 395 (1989); Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004). When construing an excessive force claim, this Court must consider whether the Officers' use of force was objectively reasonable under the

---

[20]   Plaintiff's claim arises under 42 U.S.C. § 1983. Section 1983 provides, in pertinent part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

42 U.S.C. § 1983. The law does not create any substantive rights but rather provides "an avenue of recovery for the deprivation of established federal constitutional and statutory rights." Salley v. Rodriguez, No. 07–4914, 2008 WL 65106 at *4 (D.N.J. Jan.4, 2008); see also Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d. Cir.1995). To establish a § 1983 claim, a plaintiff must demonstrate that the alleged conduct was committed by "(1) a person acting under color of state law and (2) that the conduct deprived him of rights, privileges, or immunities secured by the Constitution or the laws of the United States." Stahl v. Main, No. 07–4123, 2008 WL 2446816, at *3 (D.N.J. June 16, 2008); Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106 (1989).

circumstances, regardless of the their underlying motive or intentions.   Graham, 490 U.S. at

397.   In Graham, the Supreme Court expounded on the reasonableness inquiry, stating that it

"requires careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

flight."  Id. at 396.   In addition, the Third Circuit has noted other relevant factors including "the

duration of the [officer's] action, whether the action takes place in the context of effecting an

arrest, the possibility that the suspect may be armed, and the number of persons with whom the

police officers must contend at one time."   Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997)

(abrogated on other grounds by Curley v. Klem, 499 F.3d 199 (3d Cir. 2007)); see also Couden

v. Duffy, 446 F.3d 483, 496-97 (3d Cir. 2006); Doby v. DeCrescenzo, 171 F.3d 858, 874 (3d Cir.

1999) ("Significant factors in evaluating the force used by the police are whether the person

being taken into custody is resisting or attempting to resist by flight.").

When weighing these factors, courts should evaluate the officers' conduct from the

officers' vantage point at the time of the incident; thus the reasonableness of a particular use of

force

> must be judged from the perspective of a reasonable officer on the scene, rather
> than with the 20/20 vision of hindsight . . .   Not every push or shove, even if it
> may later seem unnecessary in the peace of a judge's chambers, violates the
> Fourth Amendment.   The calculus of reasonableness must embody allowance
> for the fact that police officers are often forced to make split-second
> judgments—in circumstances that are tense, uncertain, and rapidly
> evolving—about the amount of force that is necessary in a particular situation.

Graham, 490 U.S. at 396–97 (internal quotations and citations omitted).

Finally, "[t]he reasonableness of the use of force is normally an issue for the jury."  Rivas

v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004).  "[A] police officer who is accused of having used excessive force is not 'precluded from arguing that he reasonably perceived the facts to be different from those alleged by the plaintiff,' but that 'contention . . . must be considered at trial.'"  Id. at 199 (emphasis in original and citation omitted).  Nonetheless, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances."  Kopec v. Tate, 361 F.3d 772, 777 (3d Cir. 2004) (citations omitted); Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005).

In the present case, the first issue in evaluating Plaintiff's claim is whether, construing the evidence in the light most favorable to Plaintiff, there is sufficient evidence from which a trier of fact could reasonably conclude that Officer Szotak's and Officer Hilbert's use of force was objectively unreasonable under the circumstances.  Thomas v. City of Erie, 236 F. App'x 772, 776 (3d Cir. 2007).  Again, the Court accepts Plaintiff's version of the incident as true, but only insofar as that version is, pursuant to Heck, consistent with Plaintiff's disorderly persons conviction, and further, consistent with what occurred in the video footage of the incident. Scott, 550 U.S. at 380-81.

Plaintiff's excessive force argument is relatively straightforward and limited: Plaintiff argues that Officers Szotak and Hilbert used excessive force during their arrest of Plaintiff when the Officers (1) executed the "take down" maneuver of Plaintiff, physically moving him to the ground, and (2) handcuffed Plaintiff behind his back after he was placed on the ground.  See, e.g., Compl. at ¶24; Pl. Opp. to BCC Def. at 48, 51; Pl. Mat. Facts at ¶¶ 137-43.[21]  To be clear,

---

[21]    Plaintiff further alleges that he sustained injuries as a result of his arrest.  See, e.g., Compl., ¶ 33.   Plaintiff states in his statement of material facts that these injuries include a flare

Plaintiff has not pled or argued that Officers Szotak and Hilbert used excessive force prior to Plaintiff's arrest or at any point after Plaintiff's arrest had been completed.[22]   Thus, Plaintiff's excessive force claim is limited to the Officers' actions effecting Plaintiff's arrest, i.e., beginning at the point where Officers Szotak and Hilbert executed the take down of Plaintiff and concluding when Plaintiff had been fully handcuffed.[23]   The Court will accordingly limit its excessive force analysis to this conduct, almost all of which appears in the Video.

As noted previously, the BCC Defendants move for summary judgment on Plaintiff's excessive force claims in two ways.   First, the BCC Defendants argue that Officers Szotak and Hilbert used objectively reasonable force to arrest Plaintiff, as is supported by the Video. Second, the BCC Defendants argue that that even if Officers Szotak and Hilbert's use of force was unreasonable, and thus excessive, they are nevertheless entitled to a qualified immunity defense on the basis that their use of force did not violate a clearly established right.   I will address each of these arguments in turn.

The Third Circuit has identified a non-exhaustive list of factors to determine whether the force employed during a seizure was reasonable.   These factors include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or

---

up of his ulcerative colitis, id. at ¶ 207, spinal column injuries to his neck and back, id. at ¶ 210-12, and emotional trauma such as depression, nightmares, and post-traumatic stress.   Id. at ¶ 202-206.   In line with the Third Circuit's holding in Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997), the Court considers the nature and extent of Plaintiff's alleged injuries as one of the circumstances to be considered under the objective reasonableness standard set forth in Graham v. Connor, 490 U.S. 386, 397 (1989), in connection with the BCC Defendants' qualified immunity defense.

[22]     For example, Plaintiff does not allege, as is often common in other excessive force cases, that the Officers kicked, beat, or otherwise injured Plaintiff after the lawful arrest had concluded. See, e.g., Wade v. Colaner, No. 06-FLW-3715, 2010 WL 5479629 (D.N.J. Dec. 28, 2010).

[23]     But see infra, Footnote 26, regarding Plaintiff's arguments that he had been handcuffed too tightly.

others; (3) whether the suspect is actively resisting being seized or attempting to evade seizure by flight; (4) the possibility that the suspect is violent or dangerous; (5) the duration of the police action; (6) whether the police action takes place in the context of effecting an arrest; (7) the possibility that the suspect may be armed; and (8) the number of persons the officer must contend with at one time.   Kopec, 361 F.3d at 776-77.   Not all of these factors are relevant in all cases, and other factors may be considered.   See id.

As the following analysis makes clear, the vast majority of these factors support a finding that the Officers' use of force was reasonable under the circumstances, thus weighing against a finding of excessive force.   At the initiation of the events leading to of Plaintiff's arrest, when Officers Szotak and Hilbert arrived at the scene, Plaintiff had just turned his car onto a road that was closed to vehicles and fully occupied with pedestrians, the vast majority of whom were attending the evening festivities related to the annual Fourth of July fireworks show.   Indeed, as the Officers approached Plaintiff's car, they were surrounded by throngs of people.   This crowd, which remained present throughout Plaintiff's arrest, was dense, noisy, and easily agitated, becoming increasingly excited to the point of chanting and cheering when the Officers placed Plaintiff in handcuffs.[24]

Additionally, Plaintiff was not fully cooperative with the Officers' orders to exit his vehicle and their attempts to secure him for his arrest.[25]   In convicting Plaintiff of a disorderly

---

[24]      The crowd also may have been violent, or at least belligerent, as Plaintiff's rear window of his car was shattered, apparently by either the crowd or some object thrown by a member of the crowd, although it is unclear exactly when this happened.

[25]      Moreover, although the parties dispute Plaintiff's level of cooperation with the Officers throughout Plaintiff's arrest, these disputes are largely resolved by the findings underlying Plaintiff's disorderly persons conviction and by viewing the Video.

Plaintiff contends before this Court that he was compliant with the Officers and that he never fought or attempted to flee.   The BCC Defendants claim that Plaintiff refused to stop or

persons offense, the municipal court relied on "the clear testimony . . . that [Plaintiff's] operation of a motor vehicle in the midst of thousands of people on a road that ha[d] been secured and closed to motor vehicles . . . constitute[d] a reckless act . . . ."   <u>See</u> Pl. Opp. to BCC Def., Ex. D. at 16-17 (Decision of Judge Berube).   In that connection, the municipal court found support for Plaintiff's conviction based on "credible testimony . . . that [Plaintiff] continued to create a continuing dangerous condition <u>in refusing the legitimate orders of the police officers . . . to exit his motor vehicle</u>."   <u>Id.</u> at 17 (emphasis added); <u>see also</u> <u>id.</u> at 18 ("[T]he clear testimony of [Officer] Szotak [describes Plaintiff's conduct] as the equivalent of resisting attempts to escort him away from the burgeoning crowd . . . .").   It is also clear from the Video that Plaintiff did not fully cooperate with the Officers' attempt to effectuate an arrest.   Plaintiff did not immediately exit his vehicle upon the Officers' approach, and even when Officer Szotak opened Plaintiff's car door, Plaintiff was slow in getting out of the car.   Video at :05s-:10s.   After the Officers had placed Plaintiff on the ground, the Video shows that Plaintiff did not cooperate with the Officers' attempts to handcuff him by continuing to move around and raising his hands, instead of lying still.   <u>Id.</u> at :20s-:35s.

Finally, it is also uncontroverted that the challenged use of force occurred entirely in the context of Plaintiff's lawful arrest, and that both the arrest and the use of force were brief in nature.   The takedown maneuver occurred in a matter of two to three seconds, and the entire arrest, from takedown to handcuffing, took only slightly more than twenty seconds.

In light of these facts, several factors weigh heavily in favor of finding that the Officers used a reasonable amount of force in executing the takedown maneuver and behind-the-back

---

exit his vehicle on their command, refused to let himself be handcuffed upon exiting the car, and resisted being handcuffed after he had been placed on the ground.

handcuffing: (1) the use of force by Officers Szotak and Hilbert occurred entirely during the context of an arrest; (2) Plaintiff acted uncooperatively throughout the arrest – even if Plaintiff may not have been actively evading arrest, he was slow to comply with the Officers' instructions and was not fully compliant in allowing the Officers to handcuff him; (3) the duration of the police action was very short – the Officers' use of force lasted mere seconds and was entirely limited to effecting Plaintiff's arrest; (4) as soon as Plaintiff had been handcuffed, the use of force ceased;[26] and lastly, (5) at all times before, during, and after the arrest, the Officers were

---

[26]      Although absent from Plaintiff's Complaint, Plaintiff also appears to argue in his proposed statement of material facts that the handcuffs were fastened excessively tight, cutting off circulation to his hands, and that his requests to the Officers and Defendant Gannon for the handcuffs to be loosened were denied.  See Pl. Mat. Facts, ¶¶ 144, 147, 149, 153-55.  Plaintiff states that the handcuffs left "marks on his wrists," id. at ¶ 155, but does not state, let alone argue or allege, that he suffered any physical injuries as a result.  I briefly address Plaintiff's contention regarding his handcuffing.

In Kopec v. Tate, 361 F.3d at 777, the Third Circuit held that overly tight handcuffs could, in some instances, support a claim of excessive force.  Nevertheless, the Kopec Court cautioned that its opinion "should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims."  Id.  In Gilles v. Davis, 427 F.3d at 207-208, the Third Circuit further delineated what facts were necessary to make a prima facie excessive force claim based on handcuffing.   The Gilles Court explained that, "[u]nlike Kopec, where the plaintiff fell to the ground and fainted with pain, obvious visible indicators of Gilles' pain were absent (other than his alleged complaint that the handcuffs were too tight) . . . Gilles demonstrated no expression or signs of discomfort at the time he was handcuffed.  Nor did Gilles seek or receive medical treatment after the fact. . . . [In contrast t]he plaintiff in Kopec alleged permanent nerve damage or which a hand-surgeon had treated him for over a year."  Id. at 208.  Lacking these essential factual allegations – obvious pain or visible discomfort, resulting injury, or necessary medical treatment – the Gilles Court concluded that there was "insufficient evidence as a matter of law for excessive force by handcuffing."  Id.

In the present case, Plaintiff has stated in this motion, but has not alleged, that he complained about the handcuffs being tight, and that the handcuffs left marks on his wrist.  Plaintiff has not alleged or stated that he was in obvious discomfort or pain, that he sustained any injuries other than "marks," or that he needed treatment for any complications relating to his being handcuffed.   Thus, to the extent that Plaintiff's excessive force claim is premised on him being handcuffed too tightly, I conclude that claim fails because Plaintiff has failed to state facts necessary for that claim to survive as a matter of law.  See id.

dealing with a very large and unruly crowd.[27]   Thus, notwithstanding that some of the Kopec

factors may weigh in favor of Plaintiff – e.g., the crime itself was relatively minor, and there is

no evidence that the Officers suspected that Plaintiff was violent or armed – I nevertheless

conclude that, overall, the Officers' use of force in arresting Plaintiff was objectively reasonable

under the circumstances.   Simply put, Officers Szotak and Hilbert were presented with a man

driving his vehicle onto a closed street and into a sizeable crowd of rowdy individuals.   It was

reasonable for the Officers to effectuate their arrest of Plaintiff, who was not entirely

cooperative, as quickly as possible, by employing routine arrest procedures that included the use

of a minimal amount of force.[28]

Indeed, the Supreme Court has explained that making an arrest "necessarily carries with

it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490

U.S. at 396; Ference v. Twp. of Hamilton, 538 F. Supp. 2d at 809 (holding that some physical

contact, alone, by police during arrest insufficient to show excessive force because "[w]ere it

---

[27]        Furthermore, Plaintiff's actions leading to his arrest – i.e., driving his car onto a closed
street occupied by a dense crowd of people – posed an imminent threat to those around him,
although this threat diminished when Plaintiff exited the vehicle.   Nevertheless, Plaintiff's
reckless conduct in driving into a crowd with his vehicle supports the Officers' use of force to
extricate Plaintiff from his vehicle and arrest him as quickly as possible, in order to prevent
Plaintiff from continuing to operate his vehicle recklessly.   See Pl. Opp. to BCC Def., Ex. D. at
16-17 (Decision of Judge Berube).

[28]        See, e.g., Lloyd v. Tassell, 384 F. App'x 960, 964 (11th Cir. 2010) ("[W]e agree with the
district court that it was constitutionally reasonable for Defendant Card to use a routine "arm
bar" takedown procedure to put Lloyd on the ground in a way that ensured Lloyd could not
access any weapons he might have before he was handcuffed."); Wasserman v. Rodacker, 557
F.3d 635, 641 (D.C. Cir. 2009) ("[I]t was reasonable for [Officer] Rodacker to apply force to
Wasserman's arm to secure his compliance during arrest. Police officers have authority to use
'some degree of physical coercion' when arresting a suspect . . . and Wasserman's refusal to
obey Rodacker's order prior to his arrest suggested that he might try to resist or escape."
(Citation omitted.)); see also Orsak v. Metro. Airports Comm'n Airport Police Dept., 675 F.
Supp. 2d 944, 957 (D. Minn. 2009) ("The use of handcuffs . . . is a standard practice in nearly
every arrest.").

otherwise, police officers might have to rely on verbal instructions alone to effect an arrest for fear of section 1983 liability").   Thus, not every push or shove is excessive force, id. at 396, and in some circumstances even a "gratuitously violent shove" will still not raise to the level of excessive force.   Saucier, 533 U.S. at 208.   Moreover, the alleged force used against Plaintiff in this case pales in comparison to other cases in which courts found the use of force to be excessive.   See, e.g., Couden, 446 F.3d at 496-97 (force was excessive where four officers jumped on a cooperative suspect, sprayed him with mace and pointed firearms at his head); Rivas, 365 F.3d at 198-200 (finding excessive force where officers beat and suffocated a suspect who was in the midst of a seizure); see also Solomon v. Auburn Hills Police Dep't, 389 F.3d 167, 174-75 (6th Cir. 2004) (police shoved unresisting victim into a display case and fractured her arm by yanking it behind her back).   Accordingly, I conclude that the BCC Defendants have carried their burden on summary judgment as to Count I of Plaintiff's Complaint by demonstrating that the Officers' use of force was objectively reasonable under the circumstances, and thus, as a matter of law, Plaintiff's excessive force claim must be dismissed.

Moreover, even assuming arguendo that the Officers' use of force was unreasonable, I would nevertheless conclude that Officers Szotak and Hilbert are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   Bayer v. Monroe County Children & Youth Servs., 577 F.3d 186, 191 (3d Cir. 2009) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). This defense strikes a balance, shielding those officers from liability that mistakenly, but reasonably, believed their actions were lawful while permitting a plaintiff to recover against

those defendants that knowingly violated the plaintiff's rights.   Curley v. Klem, 499 F.3d 199, 206-207 (3d Cir. 2007).

Accordingly, in assessing whether Officers Szotak and Hilbert are entitled to qualified immunity, and assuming, arguendo, that the Officers violated Plaintiff's constitutional right by employing excessive force in arresting Plaintiff, the Court examines whether that right was clearly established.   To be "clearly established" for purposes of the qualified immunity analysis, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."   Karnes v. Skrutski, 62 F.3d 485, 492 (3d Cir. 1995). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   Saucier, 533 U.S. at 202 (citation omitted). The analysis of whether a right was "clearly established" "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"   Curley, 499 F.3d at 207 (quoting Saucier, 533 U.S. at 201).

Underlying this second step in the qualified immunity analysis is the principle that room for reasonable disagreement about the application of the law is not enough.   Plaintiff's claim can only survive the second step of the qualified immunity analysis if, given his version of events, there is no room for reasonable disagreement among reasonable police officers as to the lawfulness of the Officers' actions.   "Officers who make reasonable mistakes as to what the law requires are entitled to qualified immunity."   Green v. New Jersey State Police, 246 F. App'x 158, 162 (3d Cir. 2007).   Thus, the right at issue is "clearly established" only if "it would be unreasonable for officers to believe [that Officer Szotak's and Officer Hilbert's] actions would not constitute excessive force."   Id. at 163; see also Tofano v. Reidel, 61 F. Supp. 2d 289, 304

26

(D.N.J. 1999) ("[I]f reasonable officers could believe that a certain course of conduct is unlawful but other reasonable officers could believe that the conduct was lawful, qualified immunity attaches.").

Construing the record in the light most favorable Plaintiff – but in a manner not inconsistent with Plaintiff's underlying disorderly persons conviction or the evidence presented by the Video – reveals the following relevant facts and inferences identified previously in this Opinion: Plaintiff did not immediately cooperate with the Officers to exit his vehicle, or to allow himself to be placed under arrest; the Officers used force only in the context of effecting the arrest, and ceased any use of additional force once Plaintiff had been placed completely under arrest; and the large and unruly crowd surrounding the Officers and Plaintiff presented a situation in which time was of the essence for the Officers.   In these circumstances, a reasonable police officer would not believe that executing a simple, routine takedown maneuver to effect a lawful arrest, followed by behind-the-back handcuffing, would constitute excessive force.[29]   At the very least, there is ample room for reasonable disagreement about the fact that the Officers' use of force was objectively reasonable.   I would therefore conclude that even if the Officers' use of force could be considered excessive – which I do not believe to be the case – Officers Szotak and Hilbert would nevertheless be entitled to qualified immunity on the basis that a reasonable police officer would not understand that the amount of force in this case would be considered unlawful.   Accordingly, Plaintiff's excessive force claim fails for this reason as well.

For the foregoing reasons, the Court GRANTS the BCC Defendants' motion for summary judgment on Count I of the Complaint.

---

[29]     Indeed, this is bolstered by the fact that these are routine police procedure.   See supra, Footnote 28.

### 4. Plaintiff's Remaining Federal Law Claims

I now address the remaining § 1983 claims in Plaintiff's Complaint as they concern the BCC Defendants.   These claims all derive from the same conduct surrounding Plaintiff's arrest and the alleged use of excessive force by Officers Szotak and Hilbert.   Having concluded that Plaintiff's excessive force claim does not survive the BCC Defendants' motion for summary judgment, and Plaintiff has alleged no other constitutional violation, each of Plaintiff's remaining § 1983 claims – for failure to intervene; supervisory liability; unlawful custom, practice, policy or inadequate training; and injunctive relief – necessarily must be dismissed because there is no predicate constitutional violation.   See 42 U.S.C. § 1983; Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 106 (1989) ("A determination that § 1983 is available to remedy a statutory or constitutional violation [requires that] . . . the plaintiff . . . assert the violation of a federal right.").   Accordingly, the Court GRANTS the BCC Defendants' motion for summary judgment on Counts III, IV, V, and VI.

### 5. Plaintiff's Remaining State Law Claims

Plaintiff's remaining state law claims are for assault and battery, intentional infliction of emotional distress, and negligence.   Again, all of these claims are predicated on the Officers' alleged use of excessive force in conducting a lawful arrest of Plaintiff.   Although each of these claims is without substantive merit,[30] they are also foreclosed based on my conclusion that Officers Stozak and Hilbert are immune from suit in this matter.   See Pearson, 555 U.S. at 231.

---

[30]   For example, Plaintiff's claim for assault and battery fails because the Officers were privileged under New Jersey law to use reasonable force in effecting Plaintiff's arrest.   See State v. Williams, 29 N.J. 27, 39 (1959) ("Where . . . an offender offers physical resistance to arrest or to the maintenance of custody, the officer need not retreat, but on the contrary may become the aggressor and use such force as is necessary to overcome the resistance. . . . The force used may not be more than reasonably appears to be necessary.").

Similarly, because Plaintiff has no claim against the Officers, he has no claim against any of the other BCC Defendants based on a theory of municipal liability.   See, supra, Part III.B.   Lastly, Plaintiff's claim under the New Jersey Civil Rights Act fails because Plaintiff has no predicate constitutional violation.   See Owens v. Feigin, 194 N.J. 607, 611 (2008) ("N.J.S.A. 10:6–2(c) provides a remedy against private and public defendants for a person who demonstrates that he or she has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States . . . ." (Internal quotation marks omitted.)).   Accordingly, the Court GRANTS the BCC Defendants' motion for summary judgment on Counts VII, IX, X, and XI.

**CONCLUSION**

In conclusion, Plaintiff has failed to plead any factual allegations that would plausibly connect Monmouth – through its employees or any policy or custom – to Plaintiff's arrest. Accordingly, Monmouth's motion to dismiss is GRANTED and Plaintiff's Complaint is DISMISSED without prejudice with respect to Monmouth.   If Plaintiff, in good faith, believes that he can present additional facts to sufficiently allege a claim against Monmouth, he may move for leave to file such a claim at an appropriate time.[31]

Furthermore, Plaintiff's claims against the BCC Defendants either fail to state a claim upon which relief can be granted, or fail to overcome the BCC Defendants' motion for summary judgment.   Accordingly, the BCC Defendants' motion to dismiss and for summary judgment is GRANTED and Plaintiff's Complaint is DISMISSED with prejudice in its entirety with respect to the BCC Defendants.

---

[31]   Although not considered by the Court in this Opinion, the Monmouth County Sheriff's certification, if true, gives the Court pause that Plaintiff would be able to allege any additional facts that would support Defendant Monmouth's involvement in Plaintiff's arrest.

Date: March 12, 2013                          /s/ Freda L. Wolfson
                                              The Honorable Freda L. Wolfson
                                              United States District Judge